## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DIJON SUMMERS, <br><br>       Plaintiff, <br><br> v. <br><br> EXTRITY, LLC, DAVID H. COLEMAN d/b/a EXTRITY SERVICES, and JOHN DOE DEFENDANTS 1-10, <br><br>       Defendants. | JURY TRIAL DEMANDED <br><br> Civ. No.  _____ |

## **COMPLAINT**

Plaintiff, Dijon Summers ("Plaintiff"), by and through his counsel, Mobilio Wood, files the instant Complaint against Defendants, Extrity, LLC ("Extrity"), David H. Coleman d/b/a Extrity Services ("Coleman") (collectively, the "Employer Defendants"), and John Doe Defendants 1-10, averring in support thereof as follows:

### **Introduction**

1.  This cause of action arises out of Plaintiff's former joint employment with the Employer Defendants.

2.  Plaintiff is a transgender male.  Plaintiff asserts claims and seeks monetary damages for hostile work environment, discrimination, and retaliation, in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*  Plaintiff also asserts state law claims for negligent hiring, retention, and supervision, intentional infliction of emotional distress, and civil conspiracy.

3.     As further described herein, the Employer Defendants intentionally and systematically deprived Plaintiff of his federally protected rights by, among other things, repeatedly "outing" Plaintiff's gender identity to a number of his coworkers without his consent.

4.     As a result, one such coworker who learned of Plaintiff's gender identity, Lamere Nathaniel ("Nathaniel"), began openly voicing threats to "fuck up" and "kill" Plaintiff due to the fact that he was transgender.

5.     Nathaniel is a violent, convicted criminal who had engaged in a pattern of misconduct demonstrating his disregard for human life and safety prior to his employment with the Employer Defendants, including committing sexual assault, robbery, and carrying a firearm without a license.

6.     What is worse, the Employer Defendants' Director of Operations was explicitly alerted to Nathaniel's transphobic threats against Plaintiff's life, but outright ignored the warning.

7.     Due to the Employer Defendants' failure to take corrective action, Nathaniel brutally assaulted Plaintiff in the workplace, causing severe injuries to Plaintiff and necessitating him to seek immediate medical treatment.

8.     Following Nathaniel's assault on Plaintiff, Plaintiff returned to work, where, quite incredibly, the Employer Defendants continued to "out" him to additional coworkers who were not aware of his gender identity.

9.     Plaintiff thereafter faced additional transphobic slurs from his colleagues, and was nearly assaulted for a second time during his shift.

10.    Plaintiff eventually voiced concern to the Employer Defendants about their discriminatory conduct, and was terminated the very next day.

11.    Following Plaintiff's termination, employees and/or agents of the Employer Defendants sent a series of threatening text message communications to Plaintiff – including unequivocal threats to kill Plaintiff – which were meant, at least in part, to dissuade Plaintiff from pursuing the instant action.

12.    As a result of Defendants' unlawful conduct, Plaintiff has been harmed.

## **Parties**

13.    Plaintiff is an adult individual and citizen of the Commonwealth of Pennsylvania, and is a former joint employee of Defendants Extrity and Coleman.

14.    Defendant Extrity is a Delaware limited liability company that operates a security services company located at 1601 Market St., 19th Floor, Philadelphia, Pennsylvania 19103.

3

15.    Defendant Coleman is an adult individual doing business under a Pennsylvania fictitious name, "Extrity Services", who operates a security services company located at 1601 Market St., 19th Floor, Philadelphia, Pennsylvania 19103.

16.    John Doe Defendants 1-10 is a person or persons whose identities are presently unknown.  Plaintiff believes that discovery in this action will unveil the true identities of John Doe Defendants 1-10.

17.    At all times relevant and material herein, the Employer Defendants acted by and through their ostensible and/or actual agents, servants, workmen and/or employees.

## Jurisdiction and Venue

18.    This Court has jurisdiction over Plaintiff's federal claims in accordance with 28 U.S.C. § 1331 because this civil action arises under a law of the United States and seeks redress for violations of a federal law.  This Court has jurisdiction over Plaintiff's state law claims because they are supplemental to Plaintiff's underlying federal claims and derive from a common nucleus of operative facts pursuant to 28 U.S.C. § 1367.

19.    This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this Commonwealth and this

judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice.

20.     Venue is properly laid in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction in this district.

## **Exhaustion of Administrative Remedies**

21.     On or around July 8, 2022, Plaintiff dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") against the Employer Defendants, alleging that the Employer Defendants unlawfully discriminated against him on the basis of his gender identity, and retaliated against him for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951 *et seq.* ("PHRA").

22.     On August 17, 2022, the EEOC issued a Notice of Right to Sue to Plaintiff.[1]

---

[1] Plaintiff intends to file a motion for leave to amend the instant Complaint to assert claims for violation of the PHRA against the Employer Defendants following the expiration of 12 months from the date on which he dual-filed his Charge of Discrimination with the PHRC.

## Factual Allegations

**A.**    **Plaintiff's Supervisor "Outs" Him to His Coworkers, Resulting in Plaintiff Being Harassed and Threatened Due to His Gender Identity**

23.     Plaintiff is a transgender male.

24.     Plaintiff was hired by the Employer Defendants in February 2022 as a security guard.

25.     When Plaintiff was hired, he was not provided with any anti-harassment, anti-discrimination, or complaint-reporting training and/or policies of any nature.

26.     Around the time of Plaintiff's hire, the Southeastern Pennsylvania Transportation Authority ("SEPTA") contracted with the Employer Defendants for the provision of security services.

27.     Plaintiff was thereafter staffed as a security guard at various rail lines operated by SEPTA throughout the City of Philadelphia.

28.     Soon after Plaintiff was hired, his supervisor, William Bates ("Bates"), learned that Plaintiff was transgender, and "outed" Plaintiff to several of his coworkers.[2]

---

[2] Outing is the act of disclosing an LGBT person's sexual orientation or gender identity without that person's consent.

29.     Bates verbally advised numerous employees that Plaintiff was transgender, and also displayed social media content suggesting that Plaintiff was transgender to several employees.

30.     One of the Employer Defendants' employees who learned of Plaintiff's gender identity was his coworker, Lamere Nathaniel ("Nathaniel").

31.     After learning that Plaintiff was transgender, Nathaniel began openly voicing transphobic comments about Plaintiff, including referring to Plaintiff as a "***tranny***."

32.     Even more troubling, Nathaniel began broadcasting threats to commit acts of violence against Plaintiff due to his gender identity.

33.     More specifically, Nathaniel continually boasted that he planned to "***fuck [Plaintiff] up***," and that he was "***going to end up killing [Plaintiff]***."

**B.     Nathaniel's Violent Criminal History Demonstrating His Disregard for Human Life and Safety**

34.     Prior to Nathaniel's employment with the Employer Defendants, he had been criminally charged and pleaded guilty to several crimes of violence and reckless, willful, and wanton conduct, demonstrating his disregard for the safety and well-being of others, including sexual assault, robbery, and carrying a firearm without a license.

35.     In particular, according to publicly available records, in September 2014, Nathaniel was charged with felony aggravated indecent assault, felony

7

robbery, indecent assault, attempted theft by unlawful taking, simple assault, harassment, and criminal mischief.

36.     Pursuant to the publicly docketed criminal complaint underlying the September 2014 charges, Nathaniel violently ripped a purse off of a woman's body, causing the purse strap to break, and then sexually assaulted her.

37.     In August 2015, Nathaniel pleaded guilty to assault and attempted theft by unlawful taking related to the September 2014 encounter, and was sentenced to 11 ½ months to 23 months in prison.

38.     Previously, in March 2012, publicly available records indicate that Nathaniel pleaded guilty to carrying a firearm without a license.

39.     The foregoing information concerning Nathaniel's reckless propensities was publicly available and accessible to the Employer Defendants at the time that they hired Nathaniel.

## C.     Plaintiff's Coworker Lodges a Complaint With the Employer Defendants' Director of Operations Regarding Nathaniel's Threats Towards Plaintiff, but the Employer Defendants Ignore the Complaint

40.     Several of Plaintiff's coworkers heard Nathaniel's transphobic slurs and threats, including Plaintiff's coworker, Jay Hernandez ("Hernandez").

41.     In or around late-April 2022, Hernandez called the Employer Defendants' Director of Operations, Steven Lindsay ("Lindsay"), and advised Lindsay that he had an important matter to discuss.

42.     Lindsay initially replied that he was in a meeting at the time, but after Hernandez stressed that the matter was urgent, Lindsay agreed to step out of his meeting to talk to Hernandez.

43.     Hernandez then explained that he was concerned because he had heard Nathaniel threatening to "fuck up" and "kill" Plaintiff due to his gender identity.

44.     Hernandez further requested that he no longer be staffed with Nathaniel in the future.

45.     Lindsay responded that he would "look into" Hernandez's concerns, but stated that he first needed to "get some understanding of this whole trans thing," because he had never previously encountered a similar situation.

46.     Following Hernandez's complaint to Lindsay, the Employer Defendants did not take any action whatsoever against Nathaniel.

47.     In fact, the Employer Defendants continued to schedule Nathaniel to work on the same shift as Plaintiff and Hernandez.

**D.    Nathaniel Brutally Assaults Plaintiff in the Workplace**

48.     On or around May 10, 2022, Plaintiff and Nathaniel were both scheduled to work at SEPTA's City Hall Station in Philadelphia, Pennsylvania.

49.     Near the end of Plaintiff's shift, Nathaniel approached Plaintiff without provocation and asked, "What's up with all that shit you've been talking?", implying that Plaintiff had spoken poorly about Nathaniel.

50.     Nathaniel than repeatedly screamed at Plaintiff to "come outside" and "fight."

51.     Plaintiff attempted to deescalate the situation and stated that he did not want to fight Nathaniel.

52.     Nathaniel then stated, "Watch this," and abruptly walked away.

53.     Several minutes later, one of Plaintiff's supervisors, who had learned of Nathaniel's confrontation, sent a text message to Plaintiff advising Plaintiff to "[l]eave City Hall," followed by a text message instructing Plaintiff to "[j]ust separate from Lamere [Nathaniel]."

54.     Plaintiff called his supervisor on the phone for clarification, and was instructed to meet his supervisor at SEPTA's Spring Garden Station.

55.     Plaintiff therefore boarded the next available train to SEPTA's Spring Garden Station.

56.     Before the train door closed, however, Nathaniel and two accomplices rushed into the train car and began brutally assaulting Plaintiff.

57.     Nathaniel and his accomplices repeatedly punched Plaintiff in his head and face, and attempted to pull Plaintiff's sweatshirt over his head in order to prevent him from defending himself.

58.     As the trio assaulted Plaintiff, Nathaniel repeatedly yelled that Plaintiff was a "girl" and a "bitch."

59.     The assault lasted for several minutes, until the train reached its next stop.

60.     As a result of the assault, Plaintiff suffered bruising and swelling to the left frontal region of his head, several jammed fingers, and bruising and swelling to his right forearm, and was required to seek immediate medical care.

**E.     The Employer Defendants Attempt to Justify Their Complete Failure to Take Corrective Action Prior to Nathaniel's Attack on Plaintiff**

61.     Following Nathaniel's assault on Plaintiff, Plaintiff's colleague Hernandez sent a text message to the Employer Defendants' Director of Operations, Lindsay, chastising the Employer Defendants for refusing to heed his prior warnings about Nathaniel's threats.

62.     In his text message, Hernandez stated:

> Good morning Steve [Lindsay].  It was brought to my attention that [Plaintiff] was jumped last night by Lamere [Nathaniel], this breaks my heart because I tried to prevent all of this from happening when I first gave you a call a few weeks ago to warn you about the issues Lamere [Nathaniel] had with trans people like [Plaintiff] . . . .   Anything could have happened to us by

this guy and he remained on the job.  It was very clear
from the beginning that Lamere [Nathaniel] hates trans
people as I told you on our first phone conversation.  I
always feared the worst when it came to him because no
one really knew what he would do.

63.     Lindsay replied and made clear that the Employer Defendants

believed that they did not have any responsibility to act on Hernandez's complaint,

and even shifted the blame to Hernandez for allegedly alerting Plaintiff to

Nathaniel's threats against his life:

> Hello J,
>
> At that time you were the only person he [Nathaniel]
> talked to.  ***If he was fired after you could have not been
> safe***.  Septa is a public place ***who is to say who [sic]
> wouldn't have came up there and confronted [Plaintiff]
> anyway***.
>
> ***Did you call [Plaintiff] and tell him*** because Lamere
> [Nathaniel] claims [Plaintiff] called him threatening
> saying that another co-worker told him that Lamere
> [Nathaniel] had a problem.  ***This is what escalated the
> situation***.

(emphasis added).

## F.    Plaintiff Returns to Work Following Nathaniel's Assault, and His Supervisor Continues to "Out" Him and Instigate Additional Acts of Harassment Against Him

64.     Notwithstanding the Employer Defendants' indifference towards

transphobia in their workplace, Plaintiff returned to work following Nathaniel's

assault.

65.     Incredibly, soon after Plaintiff's return to work, his supervisor, Bates, continued to "out" Plaintiff to more of the Employer Defendants' employees who were not aware of his gender identity, including employee Dymere Campbell ("Campbell").

66.     Just like Nathaniel had done, Campbell too began openly voicing disdain for Plaintiff due to his gender identity.

67.     On or around June 23, 2022, during Plaintiff's shift, he was speaking with his supervisor, Bates, when Campbell called Bates on his cell phone.

68.     After Bates spoke with Campbell for one to two minutes, Bates loudly asked, "Are you sure you want me to do that?", and then stated, "Hold on real quick," and placed the call on speaker phone.

69.     After Bates placed the call on speaker phone, he remarked, "What did you say bro?", in an attempt to cause Campbell to repeat whatever had been said before the call had been placed on speaker.

70.     In response, Campbell began screaming, "***Where's that tranny boy at!***", "***Where's that trans man at!***", and "***Where the fuck is he!***", while threatening to harm Plaintiff.

71.     Campbell then hung up the phone.

72.     One of Plaintiff's coworkers who was present during Campbell's transphobic outburst emphatically asked Bates why he placed the call on speaker phone.

73.     Bates defended both his and Campbell's conduct, and replied, "***He's just joking around***."

74.     Several minutes after the phone call had ended, Plaintiff was directed to report to SEPTA's City Hall Station, where Campbell had been working at the time.

75.     As soon as Plaintiff arrived at SEPTA's City Hall Station, Campbell approached him and shouted, "***What's up tranny boy!***", and challenged Plaintiff to "fight" him.

76.     Campbell repeatedly addressed Plaintiff as a "***tranny***" and a "***girl***," and yelled that he was going to "***fuck [Plaintiff] up***" and "***treat you like the bitch that you are!***"

77.     Campbell continued to hurl transphobic slurs towards Plaintiff, but was ultimately subdued, and was fortunately unable to complete his attempted assault upon Plaintiff.

78.     Following Campbell's outburst, Plaintiff confronted his supervisor, Bates, about Bates continually disclosing Plaintiff's gender identity and instigating others to harass him.

79.     Plaintiff attempted to explain that Bates' conduct was putting Plaintiff's safety in jeopardy.

**G.     The Employer Defendants Terminate Plaintiff for Opposing the Ongoing Harassment, but Do Not Terminate His Harassers**

80.     One day later, on June 24, 2022, Bates issued Plaintiff an "Employee Action Form" terminating his employment with the Company.

81.     Plaintiff's "Employee Action Form" attributed his termination to alleged "misconduct"; more specifically, "On Thursday June 23rd, 2022 while on shift [Plaintiff] became involved in an altercation with a fellow co-worker.  During the altercation [Plaintiff] [made] several inappropriate comments and threats towards fellow employees."

82.     The assertions set forth in the "Employee Action Form" were false.

83.     Plaintiff's "Employee Action Form" provides that it was "approved" by the Employer Defendants' Director of Operations, Lindsay.

84.     The Employer Defendants did not terminate Bates or Campbell for their discriminatory conduct.

**H.     The Employer Defendants' Agents Lodge Death Threats Against Plaintiff Following His Termination**

85.     Following Plaintiff's termination, Plaintiff received a series of anonymous and highly threatening text messages which, upon information and belief, were sent by the Employer Defendants' agents, representatives, and/or

employees, either at the direction of the Employer Defendants or with the

Employer Defendants' knowledge and consent.

86.    For instance, soon after Plaintiff's termination, he received an

unsolicited text message stating:

> *We on our way to ya house bitch* I told u last time was
> ya last time playing with me, bitch nobody was playing
> on ya phone but watch this[.]
>
> *Gonna do you just like lamere [Nathaniel] did*[.]

87.    Plaintiff also received a text message displaying images of coffins,

advising Plaintiff to "*pick 1*", and stating that he would soon "*be in one*" because

he was going to "*die*", and further referring to him as a "*faggot*":



88.     In addition, Plaintiff received a text message from an individual holding himself out as Plaintiff's former coworker and harasser, Dymere Campbell, which provided as follows:

> Yo this Dymere [Cambell] **when you so call sue the company keep my name out that shit you rat ass nigga** . . . . I won't bother you after dis just keep my name out ya mouth . . . .

(emphasis added).

89.     Upon information and belief, Defendants' threatening communications were meant, at least in part, to dissuade Plaintiff from filing a Charge of Discrimination with the EEOC and/or from commencing the instant action.

## I.      Joint Employer/Single Employer Allegations

90.     Although Plaintiff's paychecks appear to have been issued by Defendant Extrity, Defendant Coleman – operating through his Pennsylvania fictitious name, "Extrity Services" – exercised substantial control over the terms and conditions of Plaintiff's employment.

91.     Indeed, Extrity Services' website (www.extrityservices.com) indicates that Extrity Services exercises near-total control over the Employer Defendants' operations:

> ***Extrity Services*** prides itself on changing the face of security.  ***Our security professionals*** are trained with a white glove approach to security.  Ensuring not only the

guests, staff, and management are safe but that they receive outstanding customer service as well. *We let you pick* the right professional for your venue. *Let us take one more thing off your plate* by offering you licensed and insured security professionals who consistently participate in best practice training and keep security with high quality service their focus.

(emphasis added).

92.     Extrity Services' website makes numerous additional references to Defendant Coleman d/b/a Extrity Services' control: "*[W]e're just a team* of hospitality professionals that share a passion for safety and security"; "*We protect* the continuity of your business by letting you operate free of outside influence"; and, "*Our staff* is comprised of former military personnel, hospitality specialists and off duty police officers."  (emphasis added).

93.     Extrity Services' website also touts Defendant Coleman d/b/a Extrity Services' security services contract with SEPTA: "*Extrity Services* was very proud to be *one of the selected partners* for SEPTA's (Southeastern Pennsylvania Transportation Authority's) Outreach Specialists role."  (emphasis added).

94.     In addition, The Employer Defendants' Director of Operations, Lindsay, lists his occupation on his public LinkedIn page as "Director of Operations at *Extrity Services*."  Given that Plaintiff and his fellow security guards were overseen by Lindsay, who in turn holds himself out as an employee of Defendant Coleman d/b/a Extrity Services, Defendant Coleman d/b/a Extrity

Services appears to have maintained the ability to promulgate rules, assignments, and conditions of employment for Plaintiff.

95. Similarly, Devon Lindsay, who publicly identifies herself as the Human Resources Director for "***Extrity Services***", distributed an unrelated unlawful meal break policy to Plaintiff and his coworkers in or around May 2022, again indicating that Defendant Coleman d/b/a Extrity Services maintained the ability to promulgate rules, assignments, and conditions of employment for Plaintiff.

96. Further, although Plaintiff received few written policies throughout his employment, at least one written policy issued to Plaintiff purports to be authored by "***Extrity Services***," and refers to Plaintiff as an "***Extrity Services Team Member***."

97. Accordingly, Defendant Coleman d/b/a Extrity Services is liable to Plaintiff pursuant to a "joint employer," "single employer," "apparent employer," and/or agency theory of liability.

## COUNT I

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: HOSTILE WORK ENVIRONMENT
**(Plaintiff v. Employer Defendants)**

98. Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

99.     At all times relevant and material herein, Plaintiff was an "employee" as defined by 42 U.S.C. § 2000e(f).

100.    At all times relevant and material herein, Defendant Extrity was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b), and employed 15 or more persons.

101.    At all times relevant and material herein, Defendant Coleman retained sufficient control over the terms and conditions of Plaintiff's employment with Defendant Extrity such that he is liable to Plaintiff pursuant to a joint employer and/or agency theory of liability.

102.    In addition, or in the alternative, Defendant Coleman served as Plaintiff's apparent or ostensible employer.

103.    In the alternative, at all times relevant and material herein, Defendant Coleman was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b), and employed 15 or more persons.

104.    In the alternative, at all times relevant and material herein, Defendant Extrity retained sufficient control over the terms and conditions of Plaintiff's employment with Defendant Coleman such that it is liable to Plaintiff pursuant to a joint employer and/or agency theory of liability.

105.    In the alternative, Defendant Extrity served as Plaintiff's apparent or ostensible employer.

106.   In the alternative, at all times relevant and material herein, the operations of Defendants Extrity and Coleman were so entangled that nominal employees of one company were treated interchangeably with those of another, such that Defendants Extrity and Coleman are liable to Plaintiff pursuant to a "single employer" theory of liability.

107.   Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

108.   Throughout the course of Plaintiff's employment, he was subjected to unwelcomed harassment by his supervisor, Bates, as well as his coworkers, Nathaniel and Campbell, due to his gender identity.

109.   The harassment endured by Plaintiff was severe and pervasive.

110.   The harassment endured by Plaintiff detrimentally affected him, and would have detrimentally affected a similarly situated reasonable person.

111.   Plaintiff was not provided with any anti-harassment or complaint-reporting policies of any nature during his employment with the Employer Defendants.

112.   Plaintiff's harassment occurred openly and in the presence of his coworkers and supervisors, and was exacerbated by Plaintiff's supervisor, Bates.

21

113.   Plaintiff's coworker, Hernandez, complained to the Employer Defendants' Director of Operations, Lindsay, that Nathaniel had threatened to "fuck up" and "kill" Plaintiff due to his gender identity, but Lindsay ignored the complaint.

114.   The Employer Defendants either were aware, or should have been aware, of the harassment inflicted on Plaintiff, but failed to take appropriate corrective action to remedy the harassment, rendering them liable for Plaintiff's harassment.

115.   Moreover, the Employer Defendants failed to provide a reasonable avenue for Plaintiff to complain of his harassment, again rendering them liable for Plaintiff's harassment.

116.   In addition, Bates' harassment of Plaintiff culminated in Plaintiff's termination.

117.   Because Bates' harassment of Plaintiff culminated in a tangible adverse employment action, the Employer Defendants are strictly liable for Bates' conduct.

118.   Through their conduct, the Employer Defendants violated Title VII.

119.   The Employer Defendants acted with reckless indifference to Plaintiff's rights under federal law, warranting an award of punitive damages.

120.   As a result of the Employer Defendants' conduct, Plaintiff has

suffered, and continues to suffer, emotional distress, humiliation, embarrassment,

anguish, personal hardship, career and social disruption, psychological and

emotional harm, and lost wages.

## COUNT II

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964:**
**DISCRIMINATION**
**(Plaintiff v. Employer Defendants)**

121.   Plaintiff hereby incorporates the preceding paragraphs by reference as

though fully set forth at length herein.

122.   Title VII provides that it is "an unlawful employment practice for an

employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's . . . sex . . ."  42 U.S.C. § 2000e-2(a)(1).

123.   At all times relevant and material herein, Plaintiff was qualified for

the position of security guard.

124.   Prior to Plaintiff's termination, his supervisor, Bates, repeatedly

"outed" him to numerous coworkers without his consent, and encouraged

Plaintiff's coworkers to harass him due to his gender identity.

125.   Prior to Plaintiff's termination, Defendant's Director of Operations,

Lindsay, was advised that Plaintiff's coworker, Nathaniel, had threatened to "fuck

up" and "kill" Plaintiff due to his gender identity, but took no action whatsoever against Nathaniel.

126.   Plaintiff was terminated based on an "Employee Action Form" issued by Bates and approved by Lindsay, which alleged that Plaintiff had made inappropriate comments and threats towards his coworker, Campbell.

127.   The allegations set forth in the write-up were false.

128.   Moreover, neither Bates nor Campbell were terminated for directing transphobic comments and threats of violence towards Plaintiff.

129.   Through their conduct, the Employer Defendants violated Title VII.

130.   The Employer Defendants acted with reckless indifference to Plaintiff's rights under federal law, warranting an award of punitive damages.

131.   As a result of the Employer Defendants' conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, and lost wages.

## COUNT III

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: RETALIATION
### (Plaintiff v. Employer Defendants)

132.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

133.   Title VII provides that it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ."  42 U.S.C. § 2000e-3(a).

134.   During Plaintiff's tenure with the Employer Defendants, Plaintiff's supervisor, Bates, repeatedly "outed" Plaintiff's gender identity to Plaintiff's coworkers without his consent.

135.   Bates' conduct led to Plaintiff being brutally assaulted in the workplace in May 2022.

136.   On or around June 23, 2022, after Bates had "outed" Plaintiff to another one of his coworkers, Campbell, Campbell assailed Plaintiff with additional transphobic slurs and threats of violence due to his gender identity.

137.   On that same date, Plaintiff complained to Bates regarding Bates continually "outing" him, and expressed concern that Bates' conduct was jeopardizing his safety.

138.   One day later, the Employer Defendants issued Plaintiff an "Employee Action Form" terminating his employment, which alleged that Plaintiff had made inappropriate comments and threats during the encounter with Campbell.

139.   The allegations set forth in the "Employee Action Form" were false, and in any event, do not preclude a retaliation claim, because the Employer

Defendants forced Plaintiff into a confrontational situation by refusing to remedy –
and by instead actually provoking – persistent unlawful discrimination against
Plaintiff in the workplace.

140.  Neither Bates nor Campbell were terminated for directing transphobic
comments and threats of violence towards Plaintiff.

141.  Following Plaintiff's termination, the Employer Defendants directed
and/or permitted their agents to send a series of severely threatening text message
communications to Plaintiff, which were meant in part to dissuade Plaintiff from
filing a Charge of Discrimination with the EEOC and/or from commencing the
instant action.

142.  Through their conduct, the Employer Defendants violated Title VII.

143.  The Employer Defendants acted with reckless indifference to
Plaintiff's rights under federal law, warranting an award of punitive damages.

144.  As a result of the Employer Defendants' conduct, Plaintiff has
suffered, and continues to suffer, emotional distress, humiliation, embarrassment,
anguish, personal hardship, career and social disruption, psychological and
emotional harm, and lost wages.

## COUNT IV

### NEGLIGENT HIRING AND RETENTION
### (Plaintiff v. Employer Defendants)

145.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

146.   The Employer Defendants had a duty to ensure that their employees did not possess a propensity for episodes of violent and/or reckless behavior.

147.   The Employer Defendants had a duty to exercise reasonable care to protect their employees from acts of violence committed by coworkers who the Employer Defendants knew or should have known were likely to engage in violent and/or reckless acts.

148.   The Employer Defendants breached the foregoing duties by, among other things:

a)      Failing to properly screen their employees;

b)      Failing to ensure that their employees did not possess a propensity for episodes of violent and/or reckless behavior;

c)      Enabling employees who they knew possessed a propensity for violent and/or or reckless behavior to harm other employees, including Plaintiff; and

d)      Failing to protect Plaintiff from the violent and reckless acts of their employees, which the Employer Defendants knew or should have known were likely to occur at their worksites.

149.   The Employer Defendants knew or should have known that failing to properly screen their employees could result in injuries to Plaintiff.

150.   At all times material hereto, the Employer Defendants knew, or in the exercise of reasonable care should have known, that Nathaniel had a propensity for violence and reckless behavior.

151.   Indeed, prior to Nathaniel's employment with the Employer Defendants, Nathaniel had been criminally charged and pleaded guilty to several crimes of violence and reckless, willful, and wanton conduct, demonstrating his disregard for the safety and well-being of others, including sexual assault, robbery, and carrying a firearm without a license.

152.   Had the Employer Defendants performed a basic background check before hiring Nathaniel, they would have been aware of his interminable criminal behavior.

153.   In the alternative, the Employer Defendants knew of Nathaniel's propensity for violence and reckless behavior prior to his employment, but disregarded the risks of hiring such an individual.

154.   In either case, during Plaintiff's employment with the Employer Defendants, the Employer Defendants became unequivocally aware of Nathaniel's propensity for violence, when Plaintiff's coworker, Hernandez, alerted the Employer Defendants' Director of Operations that Nathaniel was threatening to "fuck up" and "kill" Plaintiff.

155.   Nevertheless, the Employer Defendants hired Nathaniel, and retained him even after they possessed actual knowledge of his propensity for violence.

156.   By hiring and retaining Nathaniel, the Employer Defendants created a situation where Nathaniel's violent and reckless tendencies could harm other employees, including Plaintiff.

157.   By hiring and retaining Nathaniel, the Employer Defendants acted in conscious disregard of, or with reckless indifference to, the known and obvious risk that Nathaniel posed to his co-workers, including Plaintiff, and the public at large, warranting an award of punitive damages.

158.   As a direct result of the negligence, carelessness, and recklessness of the Employer Defendants, Plaintiff has been harmed.

159.   All of Plaintiff's losses and damages were, are, and will be due solely to and by reason of the carelessness, negligence, and recklessness of the Employer Defendants, without any negligence or want of due care on Plaintiff's part contributing thereto.

## COUNT V

### NEGLIGENT SUPERVISION
### (Plaintiff v. Employer Defendants)

160.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

161.   The Employer Defendants had a duty to exercise reasonable care to prevent their employees from assaulting other employees, including Plaintiff.

162.   The Employer Defendants had a duty to ensure that their worksites were safe and adequately staffed and supervised.

163.   The Employer Defendants breached the foregoing duties by, among other things:

a)   Failing to maintain proper supervision of their worksites and their employees;

b)   Enabling employees who they knew possessed a propensity for violent and/or reckless behavior to harm other employees, including Plaintiff; and

c)   Failing to protect Plaintiff from the violent and reckless acts of their employees, which the Employer Defendants knew or should have known were likely to occur at their worksites.

164.   The Employer Defendants knew, or in the exercise of reasonable care should have known, that Nathaniel had a propensity for violence.

165.   Indeed, prior to Nathaniel's employment with the Employer Defendants, Nathaniel had been criminally charged and pleaded guilty to several crimes of violence and reckless, willful, and wanton conduct, demonstrating his disregard for the safety and well-being of others, including sexual assault, robbery, and carrying a firearm without a license.

166.   A simple background search would have revealed (or did reveal) all of the above.

167.   Further, Nathaniel's propensity for violence became explicitly known to the Employer Defendants during Plaintiff's employment, when Plaintiff's coworker, Hernandez, alerted the Employer Defendants' Director of Operations that Nathaniel was threatening to "fuck up" and "kill" Plaintiff.

168.   Defendant nonetheless failed to take any corrective action whatsoever against Nathaniel, continued to schedule Nathaniel to work on the same shifts as Plaintiff, and failed to adequately supervise Nathaniel.

169.   By failing to adequately supervise Nathaniel, the Employer Defendants created a situation where Nathaniel's propensities toward violence could harm other employees, including Plaintiff.

170.   Given Nathaniel's violent criminal history, coupled with Hernandez's complaints to the Employer Defendants' Director of Operations regarding

Nathaniel's threats towards Plaintiff, the harm to Plaintiff was reasonably foreseeable to the Employer Defendants.

171.   By failing to adequately supervise Nathaniel – even after being specifically alerted that Nathaniel had threatened to "fuck up" and "kill" Plaintiff – the Employer Defendants acted in conscious disregard of, or with deliberate indifference to, the known and obvious risk that Nathaniel posed to his co-workers, including Plaintiff, and the public at large, warranting an award of punitive damages.

172.   As a direct result of the negligence, carelessness, and recklessness of the Employer Defendants, Plaintiff has been harmed.

173.   All of Plaintiff's losses and damages were, are, and will be due solely to and by reason of the carelessness, negligence, and recklessness of the Employer Defendants, without any negligence or want of due care on Plaintiff's part contributing thereto.

## COUNT VI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff v. Employer Defendants and John Doe Defendants 1-10)

174.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

175.   After Plaintiff had been physically assaulted in the workplace and terminated from his employment, the Employer Defendants directed the John Doe

Defendants 1-10 to send a series of highly alarming text message communications to Plaintiff, in which they threatened to physically harm, and even kill, Plaintiff.

176.   Defendants either intended to cause Plaintiff severe emotional distress, or were reckless in not knowing that their conduct would cause Plaintiff severe emotional distress.

177.   Defendants acted in conscious disregard of, or with deliberate indifference to, the resulting risk of harm to Plaintiff, warranting an award of punitive damages.

178.   As a result of Defendants' conduct, Plaintiff suffered, and continues to suffer, severe emotional distress.

**COUNT VII**

**CIVIL CONSPIRACY**
**(Plaintiff v. Employer Defendants and John Doe Defendants 1-10)**

179.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

180.   The Employer Defendants and John Doe Defendants 1-10 conspired to intentionally inflict emotional distress upon Plaintiff.

181.   In furtherance of said conspiracy, John Doe Defendants 1-10 sent a series of highly alarming text message communications to Plaintiff, in which they threatened to physically harm, and even kill, Plaintiff.

182.   Defendants intended to injure Plaintiff through their conduct.

183.   Defendants acted in conscious disregard of, or with deliberate indifference to, the resulting risk of harm to Plaintiff, warranting an award of punitive damages.

184.   As a result of Defendants' conduct, Plaintiff suffered, and continues to suffer, severe emotional distress.

## Prayer for Relief

**WHEREFORE**, Plaintiff prays that a judgment be entered in his favor and against Defendants in the following respects:

a)     An order awarding back pay, front pay, compensatory damages, and punitive damages on Counts I, II, and III;

b)     An order awarding compensatory damages and punitive damages and Counts IV, V, VI, and VII;

c)     An order awarding attorneys' fees and expenses on Counts I, II, and III pursuant to 42 U.S.C. § 2000e-5(k);

d)     An order awarding pre-judgment and post-judgment interest; and

e)     All other relief as the Court deems just and equitable.

## Jury Demand

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

Date:  10/3/2022       BY:   */s/ Peter C. Wood, Jr.*
Peter C. Wood, Jr., Esq. (I.D. No. 310145)
**MOBILIO WOOD**
900 Rutter Ave., Box 24
Forty Fort, PA 18704
Phone: (570) 234-0442
Fax: (570) 266-5402
peter@mobiliowood.com

*Counsel for Plaintiff Dijon Summers*